(No. 59032.—

JAMES SAYLES *et al.*, Appellees, v. JAMES THOMPSON, Governor, *et al.*, Appellants.

*Opinion filed December 1, 1983.*

CLARK and SIMON, JJ., dissenting.

Neil F. Hartigan, Attorney General, of Springfield (Patricia Rosen, Assistant Attorney General, of Chicago, of counsel), for appellants.

Charles Hoffman, Jan Susler, Shelley A. Bannister, and Margaret Byrne, all of Chicago, for appellees.

JUSTICE UNDERWOOD delivered the opinion of the court:

The representative plaintiffs in this class action are three prisoners heretofore committed to the custody of the Illinois Department of Corrections and presently confined in Illinois prisons. They brought this action in the circuit court of Cook County on behalf of all Illinois prisoners subject to the Interstate Corrections Compact (Ill. Rev. Stat. 1981, ch. 38, par. 1003—4—4) seeking a declaration that transfers of inmates to out-of-State prisons pursuant to that compact would violate the transportation clause of our constitution (Ill. Const. 1970, art. I, sec. 11). The Governor and the Director of the Department of Corrections were named as defendants, and plaintiffs prayed that enforcement of the statute be enjoined.

The circuit court denied a motion by defendants to dismiss and granted plaintiffs' motion for summary judgment, ruling that the statute was unconstitutional and enjoining its enforcement. Defendants appealed directly to this court pursuant to our Rule 302(a) (87 Ill. 2d R. 302(a)).

The sole issue on appeal is whether transfers of inmates pursuant to the Interstate Corrections Compact violate the transportation clause of our constitution. This inquiry necessitates a determination of the meaning, purpose and scope of the transportation clause.

There is, as this court has frequently emphasized, a

strong presumption that legislative enactments are constitutional (*People v. Greene* (1983), 96 Ill. 2d 334, 338; *Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 58), and one who asserts otherwise has the burden of clearly establishing the constitutional violation (*Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 303; *People v. Dale* (1950), 406 Ill. 238, 244). "A statute should be interpreted so as to avoid a construction which would raise doubts as to its validity. (*Morton Grove Park District v. American National Bank & Trust Co.* (1980), 78 Ill. 2d 353, 363.) It is our duty to construe acts of the legislature so as to affirm their constitutionality and validity, if it can be reasonably done, and further if their construction is doubtful, the doubt will be decided in favor of the validity of the law challenged. *Continental Illinois National Bank & Trust Co. v. Illinois State Toll Highway Com.* (1969), 42 Ill. 2d 385, 389; *Illinois Crime Investigating Com. v. Buccieri* (1967), 36 Ill. 2d 556, 561." *People v. Davis* (1982), 93 Ill. 2d 155, 161-62.

The meaning of a statute or constitutional provision depends upon the intent of the drafters at the time of its adoption, and it is a long-standing principle of statutory construction that it is the court's duty to ascertain and effectuate that intent. (*In re Griffin* (1982), 92 Ill. 2d 48, 52; *People ex rel. Hanrahan v. White* (1972), 52 Ill. 2d 70, 73; *People ex rel. Cason v. Ring* (1968), 41 Ill. 2d 305, 310.) The ordinary meaning of the language employed by the drafters in the questioned constitutional or statutory clause provides the best evidence of the drafters' intent. (*People v. Brown* (1982), 92 Ill. 2d 248, 255; *People v. Robinson* (1982), 89 Ill. 2d 469, 475-76; *People v. Haron* (1981), 85 Ill. 2d 261, 266.) The transportation clause provides:

"No person shall be transported out of the State *for an offense* committed within the State." (Emphasis added.) (Ill. Const. 1970, art. I, sec. 11.)

Plaintiffs describe this language as clear, explicit and unambiguous, and maintain that the language imposes a blanket ban without regard to the method, form or purpose of transportation. Plaintiffs' characterization, however, clearly overstates the breadth of the clause. If the drafters had intended to unilaterally preclude the transportation of prisoners under all circumstances and for any reason they would surely have stated so. The language of the clause is not unqualified, for it prohibits prisoner transportation only when such transportation is for the commission of an offense.

Defendants contend that the transportation clause was intended to prohibit transportation as a form of punishment for the commission of an offense since this was regarded by the drafters as particularly cruel and unusual. In support of their position defendants rely primarily on the records of the 1970 constitutional convention. They also examine the history of banishment and exile generally, emphasizing that transportation clauses in earlier Illinois constitutions were adopted for the specific purpose of protecting against these archaic forms of punishment.

In England, prior to this century, banishment from the King's dominion was a common form of punishment. (G. Dues, A History of Penal Methods: Criminals, Witches, Lunatics (1914).) English prisoners were frequently transported to the American colonies under a contract of indentured service (Crais, The Compulsion of Subjects to Leave the Realm, 6 L.Q. Rev. 388, 398 (1890).) Once our independence was secured, many States enacted constitutional safeguards against this form of punishment. (See G. Braden & R. Cohn, Illinois Constitution: An Annotated and Comparative Analysis 53 (1969).) Indeed, a prohibition against punishment by transportation has existed in every Illinois constitution, and the language of each has been virtually identical. (See Ill. Const. 1818, art. VIII, sec. 17; Ill. Const. 1848, art. XIII, sec. 18; Ill. Const. 1870, art. II, sec.

11.) The precursor to the present transportation clause was the 1870 clause, which provided:

"[N]or shall any person be transported out of the State for any offense committed within the same." (Ill. Const. 1870, art. II, sec. 11.)

Braden and Cohn explain that the purpose of this language was to protect against prisoner transportation as a cruel form of punishment:

"Historically, banishment or exile from the realm was an accepted form of punishment. The legislature has heeded the admonition against the imposition of this particularly cruel form of punishment." (G. Braden & R. Cohn, Illinois Constitution: An Annotated and Comparative Analysis 53 (1969).)

In *Du Bois v. Gibbons* (1954), 2 Ill. 2d 392, 410, this court acknowledged, in *dicta*, that the purpose of the transportation clause was to prohibit "banishment from the State as punishment." Since banishment is no longer an acceptable form of punishment Braden and Cohn consider the transportation clause anachronistic and recommend its abolition. Braden & Cohn, Illinois Constitution: An Annotated and Comparative Analysis 54 (1969).

We note, too, that, while not binding upon us, the Attorney General indicated in a 1982 opinion letter to the Director of the Department of Corrections his belief that temporary transfers of Illinois prisoners to Federal penal institutions outside Illinois were not prohibited.

During the 1970 constitutional convention there were several proposals to abolish the transportation clause and adopt instead a clause prohibiting cruel and unusual punishment (7 Record of Proceedings, Sixth Illinois Constitutional Convention 2961-64 (Committee Proposal No. 275), 3043 (Committee Proposal No. 433), 3080 (Committee Proposal No. 526).) It was argued that the transportation clause really had no contemporary significance, since banishment was no longer employed as a form of punishment. Delegate Dvorak explained that the transportation clause

was retained despite its out-dated purpose since section 11 of article I was actually tantamount to a prohibition against cruel and unusual punishment:

"The third clause, 'nor shall any person be transported out of the state for any offense committed within the same,' is akin to the second clause, being explanatory once again. It really has no contemporary significance. The historical basis is evidenced in, for instance, the settling of our original colonies where English prisoners were brought over to do the mundane work necessary for settlement. This has been interpreted in very ancient cases as being so particularly cruel that there is no absolutely decisive case law on this section alone.

Approximately one-third of our states now retain this section in their bill of rights. As indicated in our committee report, this section passed with a seven-to-five vote, and I think this is not indicative of the intent to retain this language. The five votes dissenting on retention were broken down between proponents of some akin matters—for instance, proponents of inclusion of the federal language of 'cruel and unusual punishment.' We felt, I believe as a committee, that *while we could either include or substitute that language for the existing language, we would be making no substantive changes* and, therefore, we preferred not to do it." (Emphasis added.) 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1380.

In view of these remarks, and Illinois' historical animosity towards prisoner transportation as a cruel form of punishment, we conclude that the transportation clause is violated only if and when the transportation of prisoners constitutes cruel and unusual punishment. With this premise in mind we turn to the question of whether prisoner transportation pursuant to the Interstate Corrections Compact can be characterized as cruel and unusual.

The express objective of the compact is to serve the best interests of the inmates. (Ill. Rev. Stat. 1981, ch. 38, par. 1003—4—4, art. I.) An inmate may only be transferred when "necessary or desirable in order to provide adequate

quarters and care or an appropriate program of rehabilitation or treatment." (Ill. Rev. Stat. 1981, ch. 38, par. 1003—4—4, art. IV.) Despite such concerns, plaintiffs argue that transfer to an out-of-State facility would compel the inmate to forgo, to an appreciable extent, interaction with family and friends. The transferred inmate would also be separated from counsel and the State courts. Defendants emphasize that Illinois prisons are dangerously overcrowded at this time and that this situation has created numerous security and health problems within the prisons. Defendants contend that adequate care and treatment for inmates is presently impossible and submit that the transfer of inmates to out-of-State facilities is the only workable solution to these problems.

Obviously, the hazards that have resulted from prison overcrowding are most deeply felt by the inmates themselves. In fact, we note plaintiffs alleged in paragraph 8 of their complaint that "[t]his intolerable development [an increase in prison population from 10,000 in 1978 to the present 14,000] has resulted in massive overcrowding and cruel and inhumane conditions of confinement for Illinois prisoners." The present effort to transfer them would alleviate many of the problems they confront on a daily basis. Under the compact, a transferred inmate retains all the rights and privileges he possessed while confined within the Illinois prison system. (Ill. Rev. Stat. 1981, ch. 38, par. 1003—4—4, art. IV.) Although we appreciate that the transfer of an inmate to an out-of-State facility would make visitation more burdensome, we cannot regard such transfers as cruel and unusual when the clear objective and consequence is to significantly improve their basic living conditions. Accordingly, we hold that such transfers do not violate the transportation clause. We add, however, that careful attention must be given the method of selecting inmates to be transferred in order that constitutional equal protection guarantees are not offended.

This conclusion is consistent with Federal cases that have addressed the issue. In *Sisbarro v. Warden, Massachusetts State Penitentiary* (1st Cir. 1979), 592 F.2d 1, 4, the court acknowledged that out-of-State transfers involved certain hardships to the prisoner but held that "such transfers are neither unusual nor 'cruel in the constitutional sense.' " See also *Olim v. Wakinekona* (1983), 461 U.S. 238, 75 L. Ed. 2d 813, 103 S. Ct. 1741; *Rodriguez-Sandoval v. United States* (1st Cir. 1969), 409 F.2d 529, 532.

For the foregoing reasons the judgment of the circuit court of Cook County is reversed.

*Judgment reversed.*

JUSTICE CLARK, dissenting:

It is a well-established principle, as the majority opinion itself points out, that "[t]he ordinary meaning of the language employed by the drafters in the questioned constitutional or statutory clause provides the best evidence of the drafters' intent. (*People v. Brown* (1982), 92 Ill. 2d 248, 255; *People v. Robinson* (1982), 89 Ill. 2d 469, 475-76; *People v. Haron* (1981), 85 Ill. 2d 261, 266.)" 99 Ill. 2d at 125.

In *Salmons v. Dutz* (1958), 16 Ill. App. 2d 356, the court held:

> "In considering the question raised on this appeal, recognition must be accorded the well established principle that a statute is not open to construction where the language thereof is clear and unambiguous and conveys a clear and definite meaning. [Citation.] If the legislative intention be plain from the language used the courts are not permitted to give the Act any other meaning than that therein expressed.
>
> In Sup v. Cervenka, 331 Ill. 459, the rule to which we refer is thus stated:
>
> 'It is an elementary rule in the construction of a statute that the intention of the legislature must primarily be determined from the language of the statute itself and not from conjectures *aliunde*. When that language is plain and unambiguous and conveys a clear and definite

meaning there is neither necessity nor authority for resorting to statutory construction. If the words of a statute are plain and the legislative purpose manifest, that purpose must be given effect. The courts have no legislative powers, and in the interpretation and construction of statutes their sole function is to determine, and within the constitutional limits of the legislative power to give effect to, the intention of the legislature. They cannot read into a statute something that is not within the manifest intention of the law-making body as gathered from the statute itself. To depart from the meaning expressed by the words is to alter a statute—it is to legislate and not to interpret. If the obvious meaning of a statute should be followed by harsh consequences, such a result cannot influence the courts in administering the law.' " 16 Ill. App. 2d 356, 361.

The transportation clause provides:

"No person shall be transported out of the State for an offense committed within the State." (Ill. Const. 1970, art. I, sec. 11.)

The transportation clause clearly does not state, as the majority suggests, that a person shall not be transported out of the State for an offense committed within the State only if it constitutes cruel and unusual punishment. The majority concludes "that the transportation clause is violated only if and when the transportation of prisoners constitutes cruel and unusual punishment." (99 Ill. 2d at 128.) I do not agree.

The clear language of the transportation clause should not be ignored. Since the language is clear and unambiguous, it is not necessary to go outside the language of the transportation clause to determine the intention of the constitutional convention.

The majority discusses the fact that several proposals were made during the 1970 constitutional convention to abolish the transportation clause and adopt instead a clause prohibiting cruel and unusual punishment. It further notes the remarks of one of the delegates to the convention re-

garding the alleged obsolescence of the transportation clause. The majority reasons that these proposals and the remarks of the delegate are indicative of the constitutional convention's intent. However, the fact remains that the transportation clause was not abolished nor was it altered. It still remains in our constitution. Therefore, it is reasonable to conclude that it was the intention of the constitutional convention that it remain in effect as written.

Prison overcrowding should not affect our interpretation of the Illinois Constitution. The transportation clause of our constitution has not changed significantly since 1818 (*cf.* Ill. Const. 1818, art. VII, sec. 17; Ill. Const. 1848, art. XIII, sec. 18; Ill. Const. 1870, art. II, sec. 11; Ill. Const. 1970, art. I, sec. 11), and I disagree with the majority's belief that the exigencies of a temporary crisis should be used to justify a strained interpretation of a clear constitutional mandate. The same argument was rejected by this court in *Lane v. Sklodowski* (1983), 97 Ill. 2d 311, 318, where we noted:

> "*Amicus curiae,* John Howard Association, argues in its brief that, unless this court holds that the Director has unlimited authority to grant early release to prisoners beyond a total of 90 days per incarceration, dangerous and unconstitutional overcrowding of Illinois prisons will occur. The Director made similar arguments in a motion to stay our order of July 12, but as we stated in our order of July 15, 1983, quoted above, these are principally concerns for the General Assembly."

*Lane* does indicate that prison overcrowding could become a matter for the judiciary if Illinois prisons become so overcrowded that there was a violation of the eighth amendment's prohibition against infliction of cruel and unusual punishment (U.S. Const., amend VIII), but I do not think that the majority opinion has established that such a situation currently exists in Illinois. The only support for this proposition is a quotation from plaintiff's brief. The prisoners that have been sent to Nevada have been dis-

patched as the Illinois prison population became larger than 14,000. If the prison situation in Illinois before *Lane* already constituted cruel and unusual punishment, the prison transfer program, as it has been implemented to this date, will not improve the living conditions of the 14,000 prisoners already incarcerated in Illinois. It merely postpones the day when the legislature will have to effectively deal with the problem of prison overcrowding in this State.

As our appellate court has noted:

> " 'Such considerations cannot be utilized to sustain a construction at variance with the plain meaning of the statutory language. They are arguments appropriately addressed to the legislature. The function of this court is to construe the statute in accordance with the normal import of the words used, whatever its opinion may be regarding the desirability of results produced by the operation of the statute.' " *Mason v. Cutkomp* (1957), 15 Ill. App. 2d 378, 384.

I am also troubled by the majority's endorsement of the statute's authorization to transfer prisoners when "necessary or *desirable*." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 1003—4—4, art. IV.) Such a wide range of discretion could have extremely serious consequences. If this opinion is adopted, we could abolish the prison system in Illinois and send all of our prisoners to other States with lower wages and construction costs. Although such a draconian development is unlikely, I can foresee other abuses that such discretion encourages. If we endorse the statute in question, future administrators may find it necessary or desirable to banish prisoners to distant States if they show a talent for assisting other prisoners in learning about the laws that imprisoned them, or assisting others in the preparation of *habeas corpus* petitions. Prison administrators could effectively punish prisoners without troublesome judicial supervision.

I do not understand the majority's reliance on the com-

mon law development of prisoner banishment. Exile to Australia or the new colonies was conceived as a particularly odious form of punishment. The distance from relatives and loved ones produced a tremendous strain on the early convicts banished to Australia or the new colonies, although the living conditions, climate, space, and food were often better than in England. Nevada is certainly not as far as Australia, but impoverished relatives of Illinois inmates may find the financial burden of transportation too great to bear. Illinois' exiles will be effectively cut off from contact with their friends, relatives and attorneys. In addition, I am concerned over whether our State will provide adequate facilities to monitor conditions in out-of-State prisons to insure humane and fair treatment of Illinois prisoners once they are in the custody of authorities in other States.

Finally, I would like to recall the judicial philosophy of the late Justice Black of the United States Supreme Court. His strict interpretation of the United States Constitution was epitomized by his construction of the first amendment (U.S. Const., amend. I). He interpreted the phrase "Congress shall make no law *** abridging the freedom of speech" to mean just that—no law. He would not tolerate interpretations that indorsed some laws, as long as they were reasonable. (See Frank, Mr. Justice Black, The Man and His Opinions 253-309 (1949).) In the case at bar, we have the clear language of the Illinois Constitution:

"No person shall be transported out of the State for an offense committed within the State." Ill. Const. 1970, art. I, sec. 11.

The Illinois Constitution does not forbid the movement of prisoners outside of the State *unless* it is reasonable, or cruel and unusual, or anything else. It simply forbids it.

I respectfully dissent.

JUSTICE SIMON joins in this dissent.