Earnest WILSON, Plaintiff,

v.

Keith COOPER, Willie D. Hayes, Shelia Buford, Raymond Miller, J. Jenkins, Howard A. Peters, III, Rick Carter, and Don (last name unknown), Defendants.

No. 94 C 5914.

United States District Court,
N.D. Illinois,
Eastern Division.

April 17, 1996.

Earnest Wilson, Joliet, Illinois, pro se.

Thomas Lee Ciecko, Illinois Attorney General's Office, Chicago, Illinois, Susan Takata O'Leary, Illinois Department of Corrections, Chicago, Illinois, for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court is defendants Howard Peters, III's ("Peters"), Willie Hayes' ("Hayes"), James Jenkins' ("Jenkins"), and Raymond Miller's ("Miller") (collectively, "defendants") motion for summary judgment on Counts III, IV, and V of plaintiff Earnest

Wilson's ("Wilson") amended complaint. For the reasons that follow, the court grants defendants' motion for summary judgment.

## I. *BACKGROUND* [1]

Wilson currently is serving a life sentence for a murder that he committed while incarcerated by the Illinois Department of Corrections ("IDOC") for an earlier murder conviction. Although originally in the custody of the IDOC, in 1992 Wilson was transferred to the Arizona Department of Corrections pursuant to a swap agreement between Illinois and Arizona. Most of Wilson's allegations in his complaint against defendants arise out of this transfer to Arizona, and subsequent trips back to Illinois for court appearances.

On November 13, 1992, the IDOC transferred Wilson from Dixon Correctional Center in Illinois to the Arizona Department of Corrections. In October 1993, Wilson was brought back to Illinois for a court appearance and placed in the custody of the Joliet Correctional Center. On December 2, 1993, Wilson was returned to the custody of the Arizona Department of Corrections.

In February 1994, Wilson again was transported from Arizona to Illinois for a court appearance. On February 11, 1994, Carter and Don, who, according to Wilson, were acting as agents, employees, or servants of both the IDOC and Prisoner Extradition, Inc., took custody of Wilson to return him to Illinois. Carter and Don placed leg shackles, hand cuffs, a waist chain, and a black security box securing Wilson's hands on Wilson. During the 33-hour trip from Arizona to Illinois, Wilson was in excruciating pain because of how Carter and Don had secured him. His hands and wrists were cut and bruised and bleeding, and had become swollen and numb, and his ankles and feet had become swollen and numb. Carter and Don refused to alleviate Wilson's pain, explaining that "this is how Howard Peters wants it done."

In New Mexico, in what Wilson calls a desperate attempt to obtain help, Wilson kicked out the side window of the van in which he was being transported and began yelling out the window. Wilson was temporarily jailed, then returned to the custody of Carter and Don, who restrained him in the same manner but even more tightly. During the remainder of the trip to Illinois, Wilson was forced to eat by putting his face into his meals because he could not use his hands. He also was not allowed to use a bathroom when he needed to.

Wilson arrived in Illinois on February 13, 1994. Within a day of Wilson's arriving at Joliet Correctional Center ("Joliet"), a doctor examined Wilson and issued a medical order that Wilson was to be restrained only by leather restraints until the injuries to his wrists, hands, ankles, and feet healed. However, while transporting Wilson to and from the Circuit Court of Will County on at least one occasion, Hayes used the same type of metal restraints that had injured Wilson during his Arizona-to-Illinois trip.

While at Joliet, Wilson periodically was kept in cell #2 of the North Segregation Unit. According to Wilson, the conditions in his cell were deplorable. The hot and cold water merely trickled from the faucet; the toilet constantly leaked; and from a previous fire, the walls were charred, the ceiling was covered with ash, which constantly fell into the cell, and the cell had a strong and constant odor of burned wood. Miller and Jenkins knew about the cell conditions and yet continued to place Wilson in the cell, and took no actions to remedy the conditions.

Based on the above occurrences, Wilson filed this five-count cause of action in federal court pursuant to 42 U.S.C. § 1983. In Count I, Wilson alleges that Sheila Burford [2] and Keith Cooper violated his constitutional rights by depriving him of his privileges at Joliet. In Count II, Wilson alleges that Carter and Don violated his rights by restraining him so that he suffered greatly during the February 1994 trip from Arizona to Illinois. In Count III, Wilson alleges that Sheila Burford and Keith Cooper again deprived him of

---

**1.** The facts set forth in this section are taken primarily from Wilson's amended complaint.

**2.** Wilson sued "Shelia Buford." However, from defendants' pleadings, it appears that the correct spelling is "Sheila Burford," and the court uses the latter spelling throughout this opinion.

his privileges at Joliet, and that Hayes violated his constitutional rights by restraining him with metal restraints against doctor's orders. In Count IV, Wilson alleges that Jenkins and Miller violated his constitutional rights by subjecting him to deplorable prison conditions. In Count V, Wilson alleges that Peters violated his constitutional rights by transferring him to the custody of the Arizona Department of Corrections, and by ordering Carter and Don to abuse and mistreat him during the February 1994 trip from Arizona to Illinois.

Defendants now move for summary judgment on the portion of Count III against Hayes and all of Counts IV and V.

## II. DISCUSSION

### A. Standard for summary judgment

A motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The burden is on the moving party to show that no genuine issues of material fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party presents a *prima facie* showing that he is entitled to judgment as a matter of law, the party opposing the motion may not rest upon the mere allegations or denials in its pleadings but must set forth specific facts showing that a genuine issue for trial exists. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.1989). All reasonable factual inferences must be viewed in favor of the nonmoving party. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989).

### B. Count III

■ Hayes contends that his conduct in placing metal restraints on Wilson was not sufficiently serious to implicate the constitution. The court agrees.

■ The Eighth Amendment forbids the " 'unnecessary and wanton infliction of pain' " upon prisoners by prison officials. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "What is necessary to establish an 'unnecessary and wanton infliction of pain' . . . varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 1, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)).

■ For example, the standard for judging an inmate's claim that prison officials failed to attend to serious medical needs or comply with prescribed medical treatment is whether the officials exhibited deliberate indifference to the inmate's welfare. *Hudson*, 503 U.S. at 1, 112 S.Ct. at 998; *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291. Inadvertent failure to provide medical care or simple negligence does not amount to a constitutional violation. *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292. "[T]he infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal sense." *Duckworth v. Franzen*, 780 F.2d 645, 652–53 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). Negligence, gross negligence, or recklessness in the tort sense is insufficient. *Id.* at 653. The defendant must have had " 'actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it,' " or deliberately avoided acquiring knowledge of the impending harm. *McGill v. Duckworth*, 944 F.2d 344, 348, 351 (7th Cir.1991), *cert. denied*, 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992) (quoting *Franzen*, 780 F.2d at 653).

■ On the other hand, if the charge is that prison officials used excessive physical

force in violation of the cruel and unusual punishment clause, the "core inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7, 112 S.Ct. at 999. In determining whether the force used by the prison officials was wanton and unnecessary, the court may evaluate "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7, 112 S.Ct. at 999 (quoting *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085). The Eighth Amendment does not prohibit the "*de minimis* use of physical force, provided that the use of force is not of a sort '"repugnant to the conscience of mankind."'" *Hudson*, 503 U.S. at 10, 112 S.Ct. at 1000 (quoting *Whitley*, 475 U.S. at 327, 106 S.Ct. at 1088 (quoting *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292)).

Though Wilson does not specify, his claim in the present case is more akin to a failure to comply with prescribed medical treatment claim than to an excessive force claim. However, under either scenario, the result is the same. The court finds that Hayes did not act with such deliberate indifference or maliciousness that he inflicted unconstitutional punishment on Wilson.

Wilson's own deposition testimony undermines his claim that Hayes subjected him to cruel and unusual punishment. Wilson stated that Hayes put steel restraints on Wilson the morning after Wilson got the doctor's order for leather restraints. (Def.'s Local Rule 12(j) Filing App. 1 at 40.) Wilson told Hayes about the doctor's order, but Hayes told Wilson that they were going to be late for court and that Hayes would check on the doctor's order when they came back from court. (*Id.* at 40–41.) Wilson stated that when they got back from court, Hayes checked on the doctor's order. (*Id.* at 41.) Wilson stated that that was the only time Hayes did not put the leather restraints on Wilson, and that after that time, Hayes started putting leather restraints on Wilson. (*Id.*) Wilson stated that during the six

weeks he was at Joliet, whenever he had to be transported, the leather cuffs were put on him. (*Id.* at 42.)

However, contradicting the foregoing testimony, Wilson then stated that when he had to leave the institution, "they," presumably meaning prison officials, including Hayes, would not put the leather restraints on him. (*Id.* at 44.) Wilson stated that prison officials would put side chains on him, and that the chains were very big on his wrist. (*Id.*) Wilson stated that the prison officials came up with a concocted side chain for him with larger-than-normal wrist cuffs. (*Id.* at 45.) He stated that the prison officials first would put leather restraints on him, then take the handcuff and hook it onto the leather restraints, and that the prison officials started doing this because his wrist was not healing. (*Id.* at 45–46.) Wilson stated that he went outside of the institution to go to court only three or four times in the six weeks he was at Joliet. (*Id.* at 46.)

Contradicting this latter part of Wilson's testimony but consistent with the first part, Wilson's response to defendants' motion for summary judgment states that after Wilson and Hayes returned from their first trip to court, Hayes took Wilson to the hospital for medical treatment, and found out that Wilson should have been restrained in leather restraints. (Declaration in Opp. to Def.'s Mot. for Summ. J. ¶ 5.) Hayes then used leather restraints on Wilson at every other court appearance. (*Id.*)

■ The court notes that Wilson seemingly attempts to create a question of fact by contradicting himself in his deposition and pleadings. The court will not countenance a party's attempt to thwart Federal Rule of Civil Procedure 56 by creating issues of fact through inconsistent pleadings and depositions. *See Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir.1985) (party cannot create issue of fact by submitting affidavit to contradict earlier deposition). Despite Wilson's contradictory pleadings and deposition testimony, however, the court finds no question of fact that precludes summary judgment in favor of Hayes on Count III.

Considering the totality of Wilson's statements regarding the use of restraints on him,

the court finds that Hayes did not subject Wilson to cruel and unusual punishment. Wilson's pleadings and deposition testimony make clear that Hayes and other prison officials did not intend to injure Wilson but actually took steps to avoid injuring him. Even if Hayes refused initially to put leather restraints on Wilson, Wilson's testimony shows that Hayes' did so not because he desired to inflict punishment on Wilson but because he had no time to check with the doctor about the use of leather restraints. Wilson's testimony and pleadings indicate that Hayes checked with the doctor and subsequently used leather restraints on Wilson in accordance with the doctor's orders. Even if Hayes used metal restraints on Wilson the few times Wilson left the prison, which Hayes denies, the metal restraints were specially designed not to injure Wilson.

Thus, the court finds that Hayes was not deliberately indifferent to Wilson's welfare. Hayes did not consciously and culpably refuse to prevent harm to Wilson, but rather, after taking reasonable steps to verify how to restrain Wilson, attempted to avoid causing harm to Wilson. The court doubts Hayes' actions even amount to negligence.

Furthermore, the court finds that Hayes applied force by initially using metal restraints on Wilson "in a good-faith effort to maintain ... discipline." *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. Hayes obviously needed to restrain Wilson, a potentially dangerous person, and used metal restraints to do so until he could verify the doctor's order to use leather restraints. Hayes did not use an unreasonable amount of force against Wilson, given his need to restrain Wilson. *See id.* Moreover, Hayes made an effort to temper his use of force. *See id.* As soon as Hayes verified the doctor's order, Hayes took steps to avoid injuring Wilson, whether by using leather restraints or using larger-than-normal metal restraints. In short, Hayes' use of force against Wilson is not the sort that is "repugnant to the conscience of mankind." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.

Accordingly, the court finds that Hayes' actions do not amount to an unconstitutional infliction of cruel and unusual punishment on Wilson, and grants summary judgment in favor of Hayes on Count III.[3]

## C. Count IV

■ Jenkins and Miller contend that the conditions of cell # 2 were not sufficiently egregious to constitute punishment in violation of the Eighth Amendment. The court agrees.

■ An inmate's claim that prison officials inflicted cruel and unusual punishment on him because of the conditions of his confinement has both an objective component and subjective component. First, the claimed deprivation must be sufficiently serious to constitute a constitutional violation—the objective component. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). Second, the defendants must have acted with a sufficiently culpable state of mind—the subjective component. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999; *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324. The inmate must establish both elements to succeed on his claim. *See Hudson,* 503 U.S. at 7, 112 S.Ct. at 999; *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324.

■ To amount to a constitutional violation, conditions of confinement must result in "extreme deprivations." *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000. "Because routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' ... 'only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation.'" *Id.* (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324 (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399)).

In the present case, Wilson's deposition testimony again belies his claim. In his de-

---

**3.** Count III also contains allegations against Sheila Burford and Keith Cooper, who have not moved for summary judgment on Count III. Therefore, Count III remains pending against Sheila Burford and Keith Cooper.

position, Wilson stated that he was placed in cell #2 twice, during each of his returns to Illinois. (Def.'s Local Rule 12(j) Filing App. 1 at 47.) Upon the first return, he was kept in cell #2 for about five or six days, then was moved to a better cell. (*Id.*) Upon the second return, he was kept in cell #2 for about four or five days, then again was moved to a better cell. (*Id.*) Wilson stated that the water faucet had low pressure, and that a little stream just slivered down. (*Id.* at 49.) He stated that water would seep from the bottom of the toilet every time he used it. (*Id.*) He stated that the cell looked and smelled as if it had been in a fire. (*Id.*) He stated that Miller and Jenkins knew of the condition of the cell and still put him in it. (*Id.*)

The court finds that the conditions of cell #2 were not sufficiently egregious to violate Wilson's constitutional rights. Wilson was not forced to suffer "extreme deprivations" of "the minimal civilized measure of life's necessities." *See Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000; *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324; *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. Rather, he was subjected to discomfort for a few days on two occasions. Courts have consistently rejected conditions of confinement claims involving substantially more horrendous conditions than Wilson describes, spanning over substantially longer time periods. *See, e.g., Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir.1988) (being deprived of toilet paper for five days; not provided with soap, toothpaste, or a toothbrush for 10 days; and kept in a filthy, roach-infested cell does not violate the constitution, where the conditions were temporary and the affected inmate suffered no physical harm); *Lock v. Clark,* No. S90–327 (RDP), 1992 WL 559660, *9 (N.D.Ind. Mar. 17, 1992) (prisoner who, for seven days, was deprived of all personal property, including soap and hygienic items; was not permitted to take a shower; was confined to a strip cell; was given only one and a half rolls of toilet paper; and was left to wear nothing but his undershorts was not denied "the minimal civilized measures of life's necessities").

The court finds that the conditions of cell #2 to which Wilson was subjected for brief periods of time do not approach the level of unconstitutional punishment. Since Wilson has failed to establish the objective component of his claim, the court need not address whether Miller and Jenkins possessed the requisite state of mind to have inflicted punishment on Wilson.

Accordingly, the court finds that Miller and Jenkins did not violate Wilson's constitutional right to be free from cruel and unusual punishment, and grants summary judgment in their favor on Count IV.

### D. *Count V*

Peters argues that he did not violate Wilson's rights to due process and equal protection by transferring Wilson to the custody of the Arizona Department of Corrections, because the United States Constitution and Illinois law permit such transfers. The court agrees. The court notes that Peters fails to address Wilson's claim that Peters ordered Carter and Don to abuse and mistreat Wilson during the February 1994 trip from Arizona to Illinois. However, Peters has submitted an affidavit regarding, among other things, his role in the February 1994 incident. Therefore, the court will evaluate Peters' motion for summary judgment with respect to all of the allegations in Count V, notwithstanding Peters' lapse.

Peters' affidavit in support of his motion for summary judgment states that Wilson was transferred to Arizona pursuant to the Interstate Corrections Compact set forth in 730 ILCS 5/3–4–4. (Def.'s Local Rule 12(j) Filing App. 2 ¶5.) Peters states that he had no personal involvement in the transfer of Wilson to Arizona. (*Id.*) Peters also states that he had no knowledge of or involvement in the transport of Wilson from Arizona to Illinois in February 1994; that he has never communicated with Prisoner Extradition, Inc., or any agents of Prisoner Extradition, Inc., regarding Wilson; and that he had no role in determining the method by which Wilson was transported or the manner in which Wilson was shackled during the trip. (*Id.* ¶6.) Peters states that he neither has nor had a personal vendetta against Wilson, and that the transfer to Arizona was not completed for the "purpose of excessive and

punitive punishments." (*Id.* ¶ 7.) Wilson has submitted nothing to counter Peters' affidavit.

Count V appears to be against Peters only in his official capacity. (*See* Am. Complt. ¶ 62.) However, giving Wilson the benefit of the doubt, the court will address Count V as against Peters in both capacities.

### 1. Individual capacity

Peters' affidavit makes clear that he had no individual role in Wilson's transfer to the custody of the Arizona Department of Corrections or in Wilson's transport from Arizona to Illinois in February 1994. Once Peters submitted his affidavit, it was incumbent upon Wilson to counter the affidavit with his own evidence. *See Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514; *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Schroeder,* 875 F.2d at 620. Wilson failed to do so. Therefore, the court will accept Peters' affidavit as true.

Individual liability under section 1983 must be based upon personal responsibility. *Schultz v. Baumgart,* 738 F.2d 231, 238 (7th Cir.1984). "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a [section] 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). Furthermore, in a section 1983 action against a supervisory official, the plaintiff may not merely show that the supervisory official was "remiss in supervising the implementation of policy in force in an institution." *Rascon v. Hardiman,* 803 F.2d 269, 273–74 (7th Cir.1986). Rather, the plaintiff must show that "the official knowingly, willfully, or at least recklessly caused the alleged deprivation by his action or failure to act." *Id.*

The court finds that Peters personally played no part in Wilson's transfer to the Arizona Department of Corrections or transport from Arizona to Illinois in February 1994. Therefore, Peters cannot be held personally liable under section 1983 for any alleged violation of Wilson's constitutional rights based on these occurrences.

Accordingly, the court grants summary judgment on Count V in favor of Peters in his individual capacity.

### 2. Official capacity

Wilson's claims against Peters in his official capacity also fails, but for different reasons.

#### a. *Transfer to out-of-state prison*

In *Meachum v. Fano,* 427 U.S. 215, 224–29, 96 S.Ct. 2532, 2538–40, 49 L.Ed.2d 451 *reh'g denied,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976), the Supreme Court held that a prisoner's due process rights are not violated when the state transfers the prisoner from one institution within the state to another within the state, and that the United States Constitution does not require a hearing prior to such a transfer. In *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), the Supreme Court reiterated its holding in *Meachum,* and stated further that a state may transfer a prisoner to another institution even if the transfer is the result of the inmate's behavior or may be labeled as disciplinary or punitive.

In *Olim v. Wakinekona,* 461 U.S. 238, 245–48, 103 S.Ct. 1741, 1745–47, 75 L.Ed.2d 813 (1983), the court expanded upon its holdings in *Meachum* and *Montanye,* holding that a prisoner may be transferred from an institution in one state to an institution in another state. The court stated that "[j]ust as a prisoner has no justifiable expectation that he will be incarcerated in any particular prison within a state, he has no justifiable expectation that he will be incarcerated in any particular state." *Olim,* 461 U.S. at 245, 103 S.Ct. at 1745. The court noted that many states have corrections compacts, implemented by statutes, providing for the interstate transfer of a state prisoner to another state's prison. *Olim,* 461 U.S. at 246, 103 S.Ct. at 1746 (citations omitted).

Illinois has established such an interstate corrections compact, *see* 730 ILCS 5/3–4–4, which the Illinois Supreme Court has upheld as constitutional. *See Sayles v. Thompson,* 99 Ill.2d 122, 75 Ill.Dec. 446, 457 N.E.2d 440

(1983). In *Sayles,* the court rejected prisoners' argument that the Illinois Interstate Corrections Compact violated the Illinois Constitution's transportation clause, which states that "[n]o person shall be transported out of the State for an offense committed within the State." *Sayles,* 99 Ill.2d at 125–26, 75 Ill.Dec. at 448, 457 N.E.2d at 442. The court reasoned that the transportation clause is violated only if the transportation of prisoners constitutes cruel and unusual punishment. *Sayles,* 99 Ill.2d at 128, 75 Ill.Dec. at 449, 457 N.E.2d at 443.

The court found that the "express objective of the [Interstate Corrections Compact] is to serve the best interests of the inmates," since an inmate may be transferred only "when 'necessary or desirable in order to provide adequate quarters and care or an appropriate program of rehabilitation or treatment.'" *Sayles,* 99 Ill.2d at 128, 75 Ill.Dec. at 450, 457 N.E.2d at 444 (quoting ILL.REV.STAT. ch. 38 ¶ 1003–4–4 art. I (1981) (now 730 ILCS 5/3–4–4 art. I)). The court noted that Illinois prisons were dangerously overcrowded, which had resulted in numerous security and health problems within the prisons. *Sayles,* 99 Ill.2d at 129, 75 Ill.Dec. at 450, 457 N.E.2d at 444. It accepted the state's contention that the transfer of inmates to out-of-state facilities "is the only workable solution to these problems." *Id.* Accordingly, the court held that transfers of prisoners to out-of-state prisons pursuant to the Interstate Corrections Compact do not violate the Illinois Constitution's transportation clause. *Id.*

■ From the parties' pleadings and other submissions to the court, it appears that Wilson's incarceration in Illinois was not serving to rehabilitate him, but rather was resulting in his committing further crimes. In such a case, the transfer of Wilson to another state's prison to deter him from engaging in criminal conduct cannot be deemed cruel and unusual punishment. Rather, it is in Wilson's best interests to be prevented from engaging in conduct that will harm him or anyone else and add more time to his sentence.

■ The court finds that Wilson had no constitutional right or justifiable expectation to remain in an Illinois prison, and therefore that Peters did not violate Wilson's constitutional rights by authorizing Wilson to be transferred from an Illinois prison to an Arizona prison. The only question remaining is whether the IDOC was required to provide Wilson with notice and an opportunity to be heard prior to transferring him to an out-of-state prison.

As the Supreme Court held in *Meachum,* the United States Constitution "does not mandate a nationwide rule requiring certain procedural formalities, such as a hearing, prior to" a transfer from one institution to another. *Shango v. Jurich,* 681 F.2d 1091, 1098 (7th Cir.1982) (citing *Meachum,* 427 U.S. at 225, 96 S.Ct. at 2538). "This is true even in the case of disciplinary transfers: the due process clause, in and of itself, 'does not require hearings in connection with ... transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive.'" *Shango,* 681 F.2d at 1098 (quoting *Montanye,* 427 U.S. at 242, 96 S.Ct. at 2547). Thus, Wilson had no liberty interest in receiving a hearing prior to his transfer to Arizona, at least under the Constitution. Whether the state created such a liberty interest is another matter.

■ State statutes may create liberty interests that are entitled to procedural protection under the due process clause. *Shango,* 681 F.2d at 1099 (quoting *Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980)). The Illinois Interstate Corrections Compact creates no such liberty interest. Rather, it gives prison officials virtually unfettered discretion to transfer a prisoner, as long as the motives for the transfer are not improper. *See* 730 ILCS 5/3–4–4; *Shango,* 681 F.2d at 1098 n. 13, 1100 n. 16.

State administrative regulations also may give rise to a liberty interest. *Shango,* 681 F.2d at 1099. For example, IDOC regulations theoretically could bestow upon Wilson a liberty interest that warrants due process protection; however, they fail to do so. "A liberty interest is ... a substantive interest of an individual; it cannot be the right to

demand needless formality. In order to establish such an interest, a 'plaintiff must show a substantive restriction on the [official's] discretion.'" *Id.* at 1100–01 (quoting *Suckle v. Madison General Hosp.,* 499 F.2d 1364, 1366 (7th Cir.1974)).

IDOC regulations do not limit prison officials' discretion regarding interprison transfers, but "merely create mechanisms to be utilized by prison officials in effecting transfers." *Shango,* 681 F.2d at 1100, 1100 n. 15. "The existence of such discretion precludes the implication of a liberty interest deserving of due process protection." *Id.* at 1100 (quotations omitted). "If officials may transfer a prisoner to another prison irrespective of what the inmate may establish at an administrative hearing, the Fourteenth Amendment does not demand that the state engage in a ritualistic hearing." *Id.* at 1101–02.

Because Wilson was not constitutionally entitled to any procedural protections before being transferred to Arizona, Peters, as director of the IDOC, did not violate Wilson's right to due process by transferring Wilson without notice or hearing.

### b. *February 1994 transport from Arizona to Illinois*

■ A lawsuit against a government official in his official capacity is, in effect, a lawsuit against the government entity for which the official works. *See Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Therefore, Wilson's claim against Peters in his official capacity effectively is against the IDOC.

■ The Eleventh Amendment generally immunizes a state from suit for damages in federal court by a private party. *Kroll v. Board of Trustees of Univ. of Illinois,* 934 F.2d 904, 907 (7th Cir.), *cert. denied,* 502 U.S. 941, 112 S.Ct. 377, 116 L.Ed.2d 329 (1991). State agencies are treated the same as states. *Id.* (citing *Alabama v. Pugh,* 438 U.S. 781, 781–82, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978) (per curiam); *Gleason v. Board of Educ.,* 792 F.2d 76, 79 (7th Cir. 1986)). "[A] state agency *is* the state for

purposes of the eleventh amendment." *Id.* (citing *Davidson v. Board of Governors,* 920 F.2d 441, 442 (7th Cir.1990)).

■ Thus, the IDOC, a state agency, is entitled to eleventh amendment immunity against Wilson's claim for damages unless one of two exceptions applies. First, a state may waive its eleventh amendment immunity by "unequivocal language," and thereby consent to suit in federal court. *Kroll,* 934 F.2d at 907 (citing *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). A court will find such waiver "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Atascadero,* 473 U.S. at 239–40, 105 S.Ct. at 3146. The state of Illinois has not consented to being sued in federal court in the statute creating its Department of Corrections. *See* 730 ILCS 5/3–1–1—5/3–15–3; *Knox v. McGinnis,* 998 F.2d 1405, 1412 (7th Cir. 1993). Therefore, Illinois has not expressly and unequivocally waived the IDOC's eleventh amendment immunity.

■ Second, also by "unequivocal language," Congress may "use its enforcement powers under the fourteenth amendment to abrogate the states' eleventh amendment immunity." *Kroll,* 934 F.2d at 907 (citing *Atascadero,* 473 U.S. at 246, 105 S.Ct. at 3149 ("When Congress chooses to subject the States to federal jurisdiction, it must do so specifically") (other citations omitted)). Section 1983 actions do not fall under this exception; by enacting section 1983, Congress did not abrogate the states' eleventh amendment immunity. *See Quern v. Jordan,* 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979) (section 1983 does not "override the traditional sovereign immunity of the States").

Since neither of the foregoing exceptions applies to Wilson's claim against Peters in his official capacity, sovereign immunity bars Wilson's damages claim against it.

■ The court notes that sovereign immunity is not available in the face of a claim for injunctive relief. *See Knox,* 998 F.2d at 1412–13. Wilson appears to ask for injunc-

tive relief in his amended complaint, in which he asks that the court "[o]rder[] that all excessive, cruel and unusual punishment and mistreatments inflicted upon Plaintiff by each and all of the defendants be immediately stopped and corrected." (Am.Complt. ¶ 74.D.) However, the February 1994 trip from Arizona to Illinois obviously occurred only once, in February 1994. "Federal courts do not, as a rule, enjoin conduct which has been discontinued with no real prospect that it will be repeated." *Ragsdale v. Turnock,* 841 F.2d 1358, 1366 (7th Cir.1988). Thus, nothing remains for the court to enjoin.

Accordingly, the court grants summary judgment on Count V in favor of Peters in his official capacity.

## III. *CONCLUSION*

For the foregoing reasons, the court grants defendants Howard Peters, III's, Willie Hayes', James Jenkins', and Raymond Miller's motion for summary judgment on Counts III, IV, and V of plaintiff's amended complaint, and enters judgment in favor of those defendants.