321 S.E.2d 90

**Connie RAY and Kathy Schofield**

v.

**W. Joseph McCOY, et al.**

**No. 16286.**

Supreme Court of Appeals of
West Virginia.

July 12, 1984.

Concurring Opinion July 19, 1984.

Dissenting Opinion Sept. 27, 1984.

**2**

Ernest V. Morton, Jr., Webster Springs, for petitioners.

Silas B. Taylor, Asst. Atty. Gen., Charleston, for respondents.

NEELY, Justice:

Two West Virginians, sentenced under the law of the State of West Virginia but currently incarcerated across the continent in the State of California, petitioned this Court for a writ of habeas corpus to compel the Commissioner of the West Virginia Department of Corrections to return them to custody in West Virginia. As imprisonment of state convicts beyond the borders of West Virginia is in controversion of *W. Va. Const.* art. III, § 5, (the "transportation clause") we, accordingly, grant the writ.

**I**

This case is an outgrowth of the closure of the women's prison at Pence Springs, *W. Va. Code*, 28–5C–1 [1983] and the subsequent contract, under *W. Va. Code*, 28–5C–2 [1983], between the West Virginia Department of Corrections and the Federal Bureau of Prisons. The agreement permitted the West Virginia Department of Corrections to transfer its female prisoners to the Federal Correctional Institution at Alderson, West Virginia, in July of 1983. By the arrangement, a West Virginia Department of Corrections Warden is employed at the Alderson facility to supervise our female prisoners.

The petitioners Schofield and Ray were sentenced under state law and confined under contract in the federal facility at Alderson. Both women were obstreperous and difficult inmates. Miss Schofield, who is serving a life sentence without mercy, was fractious and violent on numerous oc-

casions during the summer and fall of 1983. She was disciplined frequently for her conduct but apparently to no avail. The authorities decided to transfer her under *W. Va. Code*, 25–1–16 [1972] to the Federal Correctional Institution at Pleasanton, California on 30 September 1983. While confined at Pleasanton, a coeducational facility, she continued to commit infractions, and became pregnant. She was removed to the Metropolitan Correctional Center in San Diego, California.

Miss Ray was sentenced from one to ten years. She was sent to Pleasanton on 27 September 1983 after two escape attempts from Alderson that resulted in federal indictments. She and Miss Schofield were informed by the federal authorities that they would be returned to Alderson, West Virginia only if they maintained "clear conduct."

The respondent Commissioner admits that recalcitrant female state prisoners at Alderson need not necessarily be transferred beyond the borders of West Virginia, but could be confined at the Huttonsville Correctional Center. The Commissioner stated, however, that the Department of Corrections attempted to follow the rehabilitative directives of this Court articulated in *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981). Therefore, transfer to modern federal facilities in California was considered the best alternative both for the tranquility of Alderson Prison and for the rehabilitation of Miss Schofield and Miss Ray. *W. Va. Const.* art. III, § 5 it is argued, does not apply to transfers out of West Virginia of state prisoners who actively resist their confinement in this state. According to the respondents, the constitutional provision forbids only banishment from the territory of West Virginia as punishment for a crime.

**II**

▮ We cannot interpret *W. Va. Const.* art. III, § 5 as limited to forbidding banishment as a punishment for a crime. The transportation clause states that, "No person shall be transported out of, or forced to leave the State for any offense committed

within the same ...." We emphasize the use of the word "forced" and hold that this article prevents a prisoner convicted under West Virginia law from involuntarily serving any portion of her sentence beyond the West Virginia borders.

Our opinion in this regard is not altered by the Illinois Supreme Court's reading of their transportation clause (which is essentially the same as ours). *Sayles v. Thompson*, 99 Ill.2d 122, 75 Ill.Dec. 446, 457 N.E.2d 440 (1983) (transportation clause not violated if out-of-state transfer is in prisoner's best interest and is not cruel and unusual punishment). Nor do we choose to follow the Vermont Supreme Court's reasoning in *Girouard v. Hogan*, 135 Vt. 448, 378 A.2d 105 (1977), where confinement of a Vermont prisoner outside of that state was regarded only as a "fortuitous consequence of a properly invoked administrative decision and not a designed denial of the State of Vermont to him imposed as a penalty." 378 A.2d at 106–07.

We note that the Vermont constitution does not contain a transportation clause and prefer the interpretation of the Supreme Court of Georgia which stated, "the historical policy of the state prohibits banishment from the state and this policy is firmly fixed in our fundamental law." *State v. Collett*, 232 Ga. 668, 669, 208 S.E.2d 472, 473 (1974). West Virginia prisoners, incarcerated in federal facilities in West Virginia, who are punished for breaking prison rules and sent out of state are effectively being punished by banishment. Such actions constitute penalties which are at loggerheads with the *Constitution*, our fundamental law.

■■■ The United States Supreme Court recently considered the question of transferring prisoners from one state to another. In *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), the Supreme Court held that a state prison inmate has no federal constitutional right not to be transferred to prison in another state. But the Supreme Court was quick to note:

A conviction, whether in Hawaii, Alaska, or one of the contiguous 48 States, empowers the State to confine the inmate in any penal institution in any State *unless there is state law to the contrary;* ...

[emphasis supplied] Note 9, at 461 U.S. 248, note 9, 103 S.Ct. 1747. West Virginia has a constitutional provision to the contrary that is clear and unambiguous. It is a well-established principle of constitutional construction that:

Where a provision of a constitution is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it should be applied and not construed.

Syl. Pt 3, *State ex rel. Smith v. Gore*, 150 W.Va. 71, 143 S.E.2d 791 (1965); Syl. Pt. 4, *State v. Pauley*, 158 W.Va. 298, 210 S.E.2d 649 (1974). West Virginia's constitutional provision clearly forbids any semblance of the punishment known at common law as "abjuration of the realm," 4 Bl.Com. 333, and subsequently as banishment, a penalty regarded by Madison to be "among the severest." J. Madison, 4 *Elliott's Debates*, 455.

Our state's hostility to banishment is not based on caprice, nor is it antiquated in spirit (although that would not relieve us of our duty to uphold the constitution). *W.Va. Const.* art. III, § 5, is still an essential prophylaxis to protect our inmates. It serves to prevent prison administrators from banishing difficult prisoners, such as Miss Schofield and Miss Ray, to distant facilities in the name of administrative convenience. The provision would, for example, deny a warden the ability to exile an inmate who became a vocal advocate of prisoners' rights and hence irksome to overworked and understaffed officials. The warden could not silence her voice by sending her to another facility in another state. To remain in West Virginia, even to complain and be difficult, is that prisoner's constitutional right.

There is another reason for the prohibition of out-of-state prisoner transfers under *W.Va. Const.* art. III, § 5. Transfer signifies a loss of state supervision over the daily treatment of inmates committed by the courts to state custody. It makes it

difficult for us regularly to monitor our inmates complaints and to insure their proper care.[1]

In addition to the lack of supervision, we realize that the family and friends of a West Virginia inmate imprisoned in California will certainly find visiting that inmate very expensive and perhaps entirely impossible. This deprivation, in turn, may produce a significant strain on our prisoners and interfere with their rehabilitation. We take note of the Consent Decree of *Scales et al. v. Gwinn*, Civil Action No. 80–2001–CH, 19 January 1984 which states:

> It shall be the policy of the Department of Corrections to provide an effective visiting program that will enhance rehabilitative efforts, establish a reasonable normalization of social relationships and satisfy security requirements of its facilities." *Scales et al. v. Gwinn*, at 11.

The isolation from family, friends and counsel which results from the petitioners' California imprisonment is in effect additional punishment not befitting their crimes.

### III

■ The respondents insist that *W.Va. Code*, 25–1–16 [1972] authorizes transfers of the type undertaken in this case. That section reads in relevant part:

> The state commissioner of public institutions shall have authority to cause the transfer of any patient or inmate from any state institution or facility to any other state or federal institution or facility which is better fitted for the care or treatment of such patient or inmate, or for other good cause or reason. *W.Va. Code*, 25–1–16 [1972].

As the interpretation of this section proposed by the respondents is in conflict with *W.Va. Const.* art. III, § 5, this Court must attempt to read the statute in *pari materia* with our constitution. See Syl.Pt. 1 *State ex rel. Simpkins v. Harvey*, 172 W.Va. 312, 305 S.E.2d 268, 269 (1983). Accordingly we hold that *W.Va.Code*, 25–1–16

[1972] applies only to inmate transfers within the State of West Virginia.

■ Of course, under established constitutional principles, *see Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), a West Virginia inmate can knowingly and intelligently waive her constitutional right to in-state imprisonment under *W.Va. Const.* art. III, § 5, should she decide, for example, that the rehabilitative programs in out-of-state federal facilities are especially attractive to her and that she does not object to separation from kith and kin.

### IV

■ Prisoners are no' one's constituents and wield little, if any, political clout. Consequently society frequently forgets about, or even ignores these people, its unfortunate charges. It is therefore incumbent upon this Court ever to be vigilant in the protection of their legal rights.

The closure of the West Virginia State Prison for Women and the successor rent-a-prison scheme embraced by the Department of Corrections must conform to our constitution. No alternative scheme may operate to deprive West Virginia of its authority over, or indeed its duty to, state female inmates. The clear constitutional provision in *W.Va. Const.* art. III, § 5 allowing our prisoners to remain in this state during their confinement may not be cast aside in the name of administrative convenience.

For the above stated reasons, this writ is granted.

Writ Granted.

MILLER, Justice, concurring:

While I concur with the result reached in this case, I am not totally in accord with the reasoning advanced by the majority.

Traditionally, in this country, the banishment question arises when a court seeks to impose a sentence on a defendant that requires him to leave the jurisdiction for a

---

**1.** This Court considered *W.Va. Const.* art. III, § 5 in footnote 2 of *Devault v. Nicholson*, 170 W.Va. 719, 296 S.E.2d 682 (1982), where we expressed doubt about housing our inmates in federal or out-of-state penitentiaries and relinquishing our supervision over them.

stated period. *See People v. Lopez,* 81 Cal.App. 199, 253 P. 169 (1927); *People v. Baum,* 251 Mich. 187, 231 N.W. 95 (1930); *Hoggett v. State,* 101 Miss. 269, 57 So. 811 (1912); *State v. Doughtie,* 237 N.C. 368, 74 S.E.2d 922 (1953); *State v. Baker,* 58 S.C. 111, 36 S.E. 501 (1900); Annot., 70 A.L.R. 98 (1931). Because the underlying criminal sentences of both petitioners carried no banishment provision, the State argues that our banishment clause, Section 5, Article III of the West Virginia Constitution, is not violated.

However, our constitutional provision is quite broad: "No person shall be transported out of, or forced to leave the State for any offence committed within the same." To my mind, there can be no doubt that petitioners were transported out of this State because of an offense that occurred within this State, i.e., the breach of prison rules at the Alderson Prison. Certainly, the term "offence," which has been defined to include any lawful act pursued by the public authorities and which gives rise to a penalty or forfeiture, is broad enough to embrace prison infractions which result in disciplinary penalties. *E.g., McMahan v. State,* 354 P.2d 476, 483 (Okla.Crim.1960); *Commonwealth v. Brown,* 264 Pa. 85, 90, 107 A. 676, 679 (1919); *Jernigan v. Commonwealth,* 104 Va. 850, 852, 52 S.E. 361,

362 (1905); *State v. Slowe,* 230 Wis. 406, 410, 284 N.W. 4, 6 (1939); *see also* Black's Law Dictionary 1282 (3d ed. 1933). In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the United States Supreme Court recognized that such infractions involve a sufficient liberty interest to warrant due process protection. We have adopted the same position in *Tasker v. Griffith,* 160 W.Va. 739, 238 S.E.2d 229 (1977). *See also Harrah v. Leverette,* 165 W.Va. 665, 271 S.E.2d 322 (1980); *Watson v. Whyte,* 162 W.Va. 26, 245 S.E.2d 916 (1978).

Furthermore, the fact that the transportation or banishment edict emanated from a prison administration is not important as the act of banishment had it origins, not in the courts, but with the king. Craies, *The Compulsion of Subjects to Leave the Realm,* 6 (No. XXIV) Law Q.Rev. 388 (1890). It was to prohibit this practice that the twelfth section of the English Habeas Corpus Act, 31 Car. II (1679), was passed.[1]

Admittedly, there is a paucity of cases involving a factual situation analogous to the present case. The Illinois Supreme Court in *Sayles v. Thompson,* 99 Ill.2d 122, 75 Ill.Dec. 446, 457 N.E.2d 440 (1983), did consider the question with regard to state prisoners who were subject to transfer under the Interstate Corrections Compact.[2] A divided court concluded that such trans-

---

**1.** Justice Marshall in note 1 of his dissent in *Olim v. Wakinekona,* 461 U.S. 238, 252, 103 S.Ct. 1741, 1749, 75 L.Ed.2d 813, 825 (1983), states:

"J. Madison, 4 Elliott's Debates, 455. Whether it is called banishment, exile, deportation, relegation or transportation, compelling a person 'to quit a city, place, or country, for a specified period of time, or for life,' has long been considered a unique and severe deprivation, and was specifically outlawed by '[t]he twelfth section of the English Habeas Corpus Act, 31 Car. II, one of the three great muniments of English liberty.' *United States v. Ju Toy,* 198 U.S. 253, 270, 25 S.Ct. 644, 649, 49 L.Ed. 1040 (1905) (Brewer, J., dissenting)."

This may not be historically accurate as it appears that the English Habeas Corpus Act, 31 Car. II (1679), was directed only against the king. Under English statutes, banishment could be imposed as part of a criminal sentence. *E.g., Rex v. Lewis,* 1 Moody 372, 168 Eng.Rep. 1308 (1832); *Rex v. Pearce,* 1 Russ. & Ry. 174, 168 Eng.Rep. 745 (1810); *Rex v. Wilson,* 1 Russ. & Ry. 115, 168 Eng.Rep. 712 (1806). W.F. Craies

in his article, *The Compulsion of Subjects to Leave the Realm,* 6 (No. XXIV) Law Q.Rev. 388, 401 (1890), states:

"The Habeas Corpus Act, while merely reinforcing the provisions of the [Magna Charta], and imposing heavy penalties on illegal deportation, was not directed against exile by conditional pardon, which indeed it may be said to have legalised, but only at abduction and transportation without trial or before conviction. The real effect of s.s. 11, 12 and 13 is much less than is usually supposed. It merely prevented transportation for misdemeanours, and the practice of spiriting which was then common (see Designy's case (1682); Raymond 474) and all private arrangements as to transporting felons, and petitions from prison to the king such as have been already referred to."

**2.** 18 U.S.C. § 5003(a) authorizes the Attorney General to contract with a state for the transfer of a state prisoner to a federal prison. It is not argued by respondent that such a compact exists with our State.

fers were not precluded by virtue of Illinois constitutional provisions against transportation out of the state. This result was reached as a result of the court's review of the record of the state's 1970 constitutional convention in which the transportation clause was stated to be "actually tantamount to a prohibition against cruel and unusual punishment." 99 Ill.2d at 128, 75 Ill.Dec. at 449, 457 N.E.2d at 443.

From this constitutional convention commentary, the court concluded "that the transportation clause is violated only if and when the transportation of prisoners constitutes cruel and unusual punishment." 99 Ill.2d at 128, 75 Ill.Dec. at 449, 457 N.E.2d at 443.

It is not possible to reach such a result under our Constitution since Section 5 of Article III of our Constitution contains both a proscription against cruel and unusual punishment and transportation out of the State for an offense committed within the State.[3] From a historical perspective, the two constitutional clauses are independent. Banishment at common law was not considered cruel and unusual punishment.[4] *See People v. Baum*, 251 Mich. 187, 231 N.W. 95 (1930); *People v. Green*, 114 Misc.2d 339, 451 N.Y.S.2d 970 (1982).

The other state case, *Girouard v. Hogan*, 135 Vt. 448, 378 A.2d 105 (1977), dealt with an interstate transfer of a Vermont prisoner to a federal out-of-state prison. The Supreme Court of Vermont treated the issue in a rather cursory fashion perhaps

because Vermont has no banishment provision in its constitution.[5]

Although the respondents cite *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), it is not on point since it involved only a claim that an interstate transfer required some procedural due process protection. There is no banishment prohibition in the United States Constitution.

Finally, I would observe that nothing in the majority opinion or in West Virginia's Constitution would foreclose the State from temporarily transporting a prisoner in this State to a prison out of state in response to a request under our Agreement on Detainers Act, W.Va.Code, 62–14–1, *et seq.*, or other laws designed to enable a demanding state to bring a prisoner incarcerated in this State to trial. Similarly, the State would not be foreclosed from temporarily removing a prisoner in this State for out-of-state treatment. Such procedures have nothing to do with a banishment-type sentence, which involves a determinate or indeterminate removal imposed for the commission of an offense within this State.[6]

McHUGH, Chief Justice, dissenting:

I respectfully dissent from the holding of the majority inasmuch as I believe that the transfers of the petitioners from the federal correctional facility at Alderson, West Virginia, to the federal correctional facilities in California did not constitute "banishment" or "transportation" as those terms

---

3. Section 5 of Article III of the West Virginia Constitution provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. Penalties shall be proportioned to the character and degree of the offence. No person shall be transported out of, or forced to leave the State for any offence committed within the same; nor shall any person, in any criminal case, be compelled to be a witness against himself, or be twice put in jeopardy of life or liberty for the same offence."

4. As indicated in note 1, many English criminal statutes *did contain banishment provisions*, and the courts enforced them without any suggestion that the punishment was cruel or unusual.

5. Chapter I of Article 21 of the Vermont Constitution only provides: "That no person shall be liable to be transported out of this state for trial for any offence committed within the same."

6. The respondents do not argue in this case that the action taken against the petitioners was temporary and unrelated to the offenses that were committed at Alderson. Furthermore, it appears that the officials at Alderson were willing prior to the transportation to transfer the petitioners to the custody of the West Virginia Department of Corrections, which retained primary legal jurisdiction over the petitioners. However, in both instances, the Department of Corrections, in effect, sanctioned the transportation by refusing to accept actual custody of the petitioners.

should be defined under *W.Va. Const.* art. III, § 5. That constitutional provision provides, in part: "No person shall be transported out of, or forced to leave the State for any offense committed within the same...."

"Banishment" is generally defined as "punishment by forced exile either for years or for life; [or] a punishment inflicted on criminals, by compelling them to quit a city, place, or country, for a period of time, or for life." 8 C.J.S. *Banishment* (Cum.Supp.1984); *see McBride v. State,* 484 S.W.2d 480 (Mo.1972); *State v. Culp,* 30 N.C.App. 398, 226 S.E.2d 841 (1976). *See generally Black's Law Dictionary* 131 (5th ed. 1979). Historically, "banishment" was " 'inflicted principally upon political offenders, "transportation" being the word used to express a similar punishment of ordinary criminals.' " *United States v. Ju Toy,* 198 U.S. 253, 270, 25 S.Ct. 644, 649, 49 L.Ed. 1040, 1047 (1905) *quoting Black's Law Dictionary* (Brewer, J., dissenting).

The "transportation" clause, as it presently exists in *W.Va. Const.* art. III, § 5, was first included in our Constitution that was adopted by the Constitutional Convention of 1872, held in Charleston. However, a detailed study of the proceedings of that 1872 convention offers little insight into the reason for the clause's appearance.

The majority and concurring opinions cite the leading cases in this subject area. Although both the majority and concurring opinions distinguish, for various reasons, the cases of *Sayles v. Thompson,* 99 Ill.2d 122, 75 Ill.Dec. 446, 457 N.E.2d 440 (1983), and *Girouard v. Hogan,* 135 Vt. 448, 378 A.2d 105 (1977), as being inapplicable to the situation now before us, when read together, I believe they offer sufficient reasoning to deny relief to the petitioners inasmuch as they both represent the modern and common practice of interstate prisoner transfers. Citing *Girouard v. Hogan, supra,* the United States Supreme Court noted in *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), that

the "conviction, not the transfer, deprived ... [the prisoner] ... of his right to freely inhabit the State. The fact that his confinement takes place outside ... [the state of the offense] ... is merely a fortuitous consequence of the fact that he must be confined, not an additional element of his punishment." 461 U.S. at 248 n. 9, 103 S.Ct. at 1747 n. 9, 75 L.Ed.2d at 822 n. 9.

I further disagree with the concurring opinion to the extent that the term "offence," as that term is used in this constitutional provision, "is broad enough to embrace prison infractions which result in disciplinary penalties." The petitioners in this case were transferred to the California facilities for violating federal requirements governing conduct and discipline in federal correctional facilities. *See* Exhibits 1 and 2, Response to Petition for Writ of Habeas Corpus. Carried to the extreme, if the petitioners have a State "constitutional right" to serve their punishment for federal prison infractions within the borders of this State, then so must all other persons who commit federal offenses within the borders of this State.

In the case now before us, petitioners Schofield and Ray were not "exiled," "transported," "banished" or forced to "quit" this State as a punishment for committing offenses under our State laws, they were sentenced to terms of life without mercy and one to ten years, respectively. Their transfers to California facilities were merely consequences of their behavior in the federal correctional facility at Alderson, West Virginia.

Based upon all of the above, I respectfully dissent from the result and reasoning of this case.