IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

_____

No. 11-1618

_____

FILED

**February 21, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

JAMES ROBERTSON,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Raleigh County
The Honorable John A. Hutchison, Judge
Case Number 01-F-130-H
AFFIRMED

_____

Submitted: February 6, 2013
Filed: February 21, 2013

Dana F. Eddy, Esq.
The Eddy Law Office
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Wendy A. Elswick, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE KETCHUM delivered the Opinion of the Court.

SYLLABUS

The clause "[n]o person shall be transported out of, or forced to leave the State for any offence committed within the same," contained in the West Virginia Constitution, art. III, § 5, does not prevent the State from sending an acquitee under *W.Va. Code* § 27-6A-1 *et seq.* [2007] to an out-of-state facility to receive treatment.

Ketchum, J.:

This is an appeal of the September 30, 2011, final order from the Circuit Court of Raleigh County transferring Petitioner James Robertson ("Mr. Robertson") to a psychiatric hospital in South Carolina. Mr. Robertson had previously been placed in two West Virginia psychiatric hospitals. Both of these placements failed to effectively treat Mr. Robertson's mental illness. Mr. Robertson had also been placed in the community under the care of a psychologist. This placement also failed. After these unsuccessful placements, the circuit court assembled a multidisciplinary team to suggest appropriate placement options for Mr. Robertson. The circuit court thereafter held a placement hearing and determined that the best available treatment option for Mr. Robertson was a South Carolina psychiatric hospital. The circuit court emphasized that its paramount concern was placing Mr. Robertson in a facility that would treat his mental illness. The circuit court therefore entered its final order transferring Mr. Robertson to the South Carolina psychiatric hospital.

Mr. Robertson appeals raising three assignments of error: (1) the order transferring him to South Carolina violates the transportation clause of the West Virginia Constitution, art. III, § 5; (2) the transfer is inconsistent with the statutory directive requiring him to be placed in the "least restrictive environment" to manage his mental illness; and (3) the transfer is not permitted under the Interstate Compact on the Mentally Disordered Offender, *W.Va. Code* § 27-15-1 [1970].

1

After considering all matters of record, we affirm the circuit court's September 30, 2011, order.[1]

## I. Facts and Background

Mr. Robertson was indicted for first degree arson, a felony offense which carries a two to twenty year prison sentence.[2] On February 22, 2002, the Circuit Court of Raleigh County entered an order finding Mr. Robertson not guilty of first degree arson by reason of mental illness. The circuit court found that

> [T]here is a factual basis whereby the state could prove, at trial, that the defendant, in fact, committed the felony of first degree arson as charged . . . but that he lacked criminal responsibility due to his mental illness or incapacity, and that he was then and remains now a danger to himself and others as a result of such mental illness.

The court ordered Mr. Robertson to be committed to Sharpe Hospital ("Sharpe"), a mental health facility in West Virginia. The circuit court retained jurisdiction over Mr. Robertson for twenty years, the maximum period of time that he could have been incarcerated for the first degree arson offense.

---

[1] While this case was pending before the Court, Patrick Morrisey was sworn into office as Attorney General for the State of West Virginia, replacing former Attorney General Darrell V. McGraw, Jr. *See* W.Va. R. App. P. 41(c).

[2] The appendix record does not include the date of this indictment or the date upon which the alleged arson occurred.

On April 28, 2005, the circuit court was advised by officials at Sharpe that Mr. Robertson attacked a patient and was physically threatening other patients. Sharpe informed the circuit court that it was "not designed to manage individuals such as Mr. Robertson, a person for whom no classic mental illness appears,[3] and who makes more effort to harm others than improve himself." Sharpe argued that Mr. Robertson suffered from a disorder, rather than a mental illness, and that he was improperly placed at Sharpe. In response to these concerns, the circuit court transferred Mr. Robertson to the Forensic Evaluation Unit operated by the Department of Health and Human Resources ("DHHR") at the South Central Regional Jail in Charleston, West Virginia. The circuit court ordered that Dr. David Clayman perform a forensic evaluation of Mr. Robertson.

Dr. Clayman's August 3, 2006, forensic report concluded that Mr. Robertson's mental problems were "dormant at this time." However, Dr. Clayman found that Mr. Robertson "clearly evidenced the pervasively maladaptive characteristics of Antisocial Personality Disorder with many other negative traits." Dr. Clayman reported that when questioned about the staff at Sharpe, Mr. Robertson replied "I hate them with a burning

---

[3] Sharpe's letter to the circuit court explained that

> When Mr. Robertson first came to Sharpe, he was believed to be suffering from Schizophrenia, or some such major mental illness. This was based on an extensive review of the record. Later, his diagnosis was changed to Bipolar Disorder, and finally, with continued evaluation, Antisocial Personality Disorder became the primary diagnosis[.]

3

passion[.]" Dr. Clayman's report concludes with his opinion that Mr. Robertson "is an extreme risk to act out again when he is living outside of the structure of the hospital or jail setting."

On December 6, 2006, the circuit court entered an order finding that Mr. Robertson continued to be mentally ill and denying Sharpe's motion to release Mr. Robertson. The circuit court concluded that Mr. Robertson remained "an extreme danger to himself and to others." Due to this finding, Mr. Robertson continued to be housed in the Forensic Evaluation Unit at the South Central Regional Jail.

On December 16, 2008, a federal complaint was filed on Mr. Robertson's behalf alleging that the amount of time he spent in the Forensic Evaluation Unit was inappropriate, and that he was not receiving proper treatment. In response to this complaint, the State developed a "community treatment plan" for Mr. Robertson and the circuit court agreed to place him in an apartment in Charleston, West Virginia, under the supervision of Dr. Clayman & Associates.[4]

---

[4] Dr. Cheryl Hill completed a Forensic Psychiatry Report on Mr. Robertson prior to his community placement. Dr. Hill concluded,

> At this time transitioning Mr. Robertson to a less restrictive environment than the FEU (forensic evaluation unit) would be appropriate. I do not recommend that he return to Sharpe Hospital, given his history with this institution this would be likely to fail. It may be appropriate to begin by allowing Mr. Robertson supervised trips into the community to allow him the opportunity to demonstrate safe behavior outside of the restrictive environment of the FEU.

Mr. Robertson's community placement lasted for approximately four months. During this time, Mr. Robertson suffered multiple psychotic episodes. These psychotic episodes included a neighbor reporting that Mr. Robertson threatened to burn down the apartment building. Dr. Clayman reported that Mr. Robertson's apartment was "chaotic" and included duct taped ceilings because he thought his neighbors were watching him. Dr. Clayman stated that the apartment's chaotic appearance was a reflection of Mr. Robertson's deteriorating mental state. Mr. Robertson was socially isolated during the community placement, and this isolation led to the psychotic episodes according to Dr. Clayman.[5]

Because Mr. Robertson experienced multiple psychotic episodes during his community placement, the circuit court ordered that he be transferred to the Mildred Mitchell-Bateman Hospital ("Bateman"), another mental health facility in West Virginia. The circuit court also directed the DHHR to formulate a multidisciplinary team to determine placement options for Mr. Robertson. The multidisciplinary team included Dr. Clayman; Dr. Bobby Miller, who was Mr. Robertson's treating psychiatrist at Bateman; and Georgette

---

If he is granted conditional release this should include a strong behavior plan with concrete consequences which are consistently enforced.

[5] Dr. Clayman described Mr. Robertson's social isolation, stating "he hated people, said he didn't want to be around people."

5

Bradstreet, the DHHR's statewide forensic coordinator.[6] The multidisciplinary team issued

a preliminary report that discussed Mr. Robertson's behavior since being sent to Bateman:

> [H]e has been combative with staff, threatening to shoot them in
> the head. Mr. Robertson has refused to go to the cafeteria for
> meals . . . [he] is refusing to go anywhere or do anything. The
> hospital staff has filed complaints with the West Virginia State
> Police concerning threats made by Mr. Robertson. Their
> primary concern is their safety and the safety of their patients.

The multidisciplinary team presented three options to the circuit court for Mr.

Robertson's next placement: (1) allow him to remain at Bateman indefinitely, (2) release him

into the community again, or (3) place him in a facility outside of the state that can provide

treatment for his mental illness. The circuit court held a placement hearing on September 21,

2011. At this hearing, the DHHR argued that it had a duty to treat Mr. Robertson and that

no facility in West Virginia could provide effective treatment for him. The DHHR therefore

looked out of state and determined that the South Carolina treatment facility was the best

treatment option because

> they have individuals there who have issues similar to Mr.
> Robertson. They have a multidisciplinary team put together for
> each patient there. That multidisciplinary team addresses the
> issues. . . . It is a cognitive-therapy approach and, in addition to
> that, there is also opportunity for getting GEDs and training and
> that kind of thing. But . . . it is not a placement where it is
> expected that Mr. Robertson would go, stay and serve out the
> remainder of his sentence. That is not the goal there. The goal
> there is to go, get him treatment and then meet with everyone

---

[6] The multidisciplinary team also included Mr. Robertson's lawyer, Dana Eddy, and Wendy Elswick, an assistant attorney general.

here in West Virginia, bring him back and hopefully return him to the community, where he will have a successful outcome.

Dr. Bobby Miller, an expert in psychiatry and a member of the multidisciplinary team, treated Mr. Robertson for six months at Bateman. Dr. Miller testified that the Bateman placement had been ineffective for Mr. Robertson and that he needed to be placed in a more restrictive environment or sent back into the community.[7] Dr. Miller stated that Mr. Robertson was a "psychological terrorist" during his time at Bateman, explaining,

> [H]e'll choose individuals who are mentally retarded or physically disabled and, on a couple of occasions, he's assaulted them. He calls the pedophiles baby rapers, he curses the staff. He's had psychiatric emergency calls . . . [H]e's been disruptive to our environment and we've had to change the treatment plan of other individuals to accommodate his being there.
>
> I manage him, and so far only two people have been assaulted, and that's not so bad. I mean, that may sound odd to say, but I'm pretty proud that we've been able to not have any really major, major issues, although we certainly have some unhappy staff and families.

When asked to predict what would happen if Mr. Robertson was given another community placement, Dr. Miller stated "within six months he'll be charged with terroristic threats and

---

[7] Dr. Miller explained these two options as follows,

> I've said two things; one is that he either needs to be in a more restricted environment or he needs to be simply sent home, that where he is right now [Bateman] is likely to continue to be ineffective, and I would think that anything that would be intermediate would also be ineffective. So, I've taken polar positions. One is to do more or to do nothing.

7

be before [the court] looking at the correctional system." He also testified that Bateman was the best placement in the state available to Mr. Robertson but that he was not receiving effective therapeutic treatment there.

Dr. Clayman also testified at the placement hearing. He stated that Mr. Robertson was not likely to be successful if given another community placement. Dr. Clayman testified that "when he's out in the world without an enormous amount of structure, something to fight against, he deteriorates, and that's what we saw. . . . I've been doing this for forty years and James [Mr. Robertson] was as psychotic as anybody I've ever seen." When asked to compare the Forensic Evaluation Unit, that Mr. Robertson had previously been housed in, with the South Carolina treatment facility, Dr. Clayman stated

> What I have been told is that it's [South Carolina] much more open, there's much more activities. There is no program at the FEU (Forensic Evaluation Unit). There is programming at the [South Carolina] facility. There is open space at this facility. There is recreation at this facility. There is structure at this facility and there is the capacity to combine both psychosocial and medical/psychiatric treatment to give him the best chance of doing things that won't get him in trouble in the future.

If placed back into the community, Dr. Clayman stated that Mr. Robertson "will behave in a way that will bring him to the attention of authorities and ultimately result in him being in the adjudicative system, rather than the mental health system."

Dr. Clayman stated that the South Carolina placement would not be to punish Mr. Robertson, it would be to treat him. Dr. Clayman stressed that he had personally treated

Mr. Robertson for a long period of time and would like to continue to treat him in West Virginia, but stated,

> [W]e don't have a place. . . . I'd love to, because I don't want James [Mr. Robertson] to go away. I really don't. I would love to be able to have something, but we don't have any options and we ran out of options in the community, given the level of intensity we were at. And we don't have any other options [in West Virginia].

Georgette Bradstreet, the statewide forensic coordinator for the DHHR and a member of the multidisciplinary team, also testified at the placement hearing. She described why there was not a treatment option available to Mr. Robertson in West Virginia:

> Mr. Robertson is a very - is an outlier. As Dr. Clayman said, he's kind of an anomaly. He's not your traditional psychiatric patient. He's not even a traditional forensic patient. Mr. Robertson has extreme personality disorder, antisocial and narcissism and, therefore, in our traditional psychiatric hospitals, the state facilities, he will not participate in treatment and, in fact, searches out to find victims that he can bully and create chaos and purposefully disrupt everything on the unit.

Ms. Bradstreet visited the South Carolina treatment facility and stated that it would be an appropriate placement for Mr. Robertson. She stated that the facility had more staff and greater security than the facilities in West Virginia. Additionally, Ms. Bradstreet testified that the patients at the South Carolina facility are higher functioning and more like Mr. Robertson as opposed to the diverse array of patients at Sharpe or Bateman, including those with dementia and mental retardation whom Mr. Robertson had violently targeted.

9

Ms. Bradstreet stated that the South Carolina facility has a treatment team for each patient that is comprised of a psychiatrist, psychologist, social workers, and nurses. The South Carolina team planned to consult with Dr. Clayman, Dr. Miller, and others who have treated Mr. Robertson and would use this input to make a specific treatment plan to address his needs. Ms. Bradstreet also testified that the South Carolina facility would periodically consult Mr. Robertson's West Virginia multidisciplinary team through video conferencing. Finally, Ms. Bradstreet stated,

> In my charge as statewide forensic coordinator, it is my job to try to make sure that we have forensic patients in the least restrictive environment. I'm very much an advocate of that . . . sometimes the least restrictive environment is someplace and something that we don't have here. And so, therefore, it's my duty to find the right place for the patient. And, therefore, since we don't have anything in West Virginia, it is my belief that this [South Carolina treatment facility] is the least restrictive environment for Mr. Robertson.[8]

---

[8] Ms. Bradstreet explained what the South Carolina treatment facility offered that was unavailable in West Virginia:

> [T]he model that's used at Sharpe and Bateman is not a rehabilitative, vocational-based model. It's more of just monitoring and controlling psychiatric symptoms. Whereas, this [South Carolina facility] is more of a model, okay, let's get the person in a cognitive behavior plan and then let's give this person some skills and skill sets and education to try to come back to their state, or whatever it is and have the ability to function in society.

10

The final witness to testify at the placement hearing was Beverly Crews, a nurse who worked at Bateman in the forensic unit. She stated that Mr. Robertson was not impossible to manage and that she does not fear for her own safety around him. She verified, however, that Mr. Robertson had been verbally abusive toward the staff and other patients.

At the conclusion of this hearing, the circuit court found that Mr. Robertson was still a danger to himself and to others and that the issue was how to properly treat him. The circuit court stated, "[I]t's not a punitive action that we're contemplating here today. We are not contemplating penalizing him for his criminal conduct. What we are looking at is finding an appropriate place to deal with the issues that have rendered him incompetent." The circuit court agreed with the DHHR, Dr. Clayman, and Ms. Bradstreet, and entered a final order on September 30, 2011, finding that the South Carolina treatment facility was the best available treatment option for Mr. Robertson. The circuit court emphasized that its paramount concern was placing Mr. Robertson in a facility that would treat his mental illness. The circuit court stated,

> He needs treatment, therefore the fact that I don't have available treatment facilities in the state of West Virginia, I think creates an obligation for me to order the Department to find a facility that can treat his issues. It's pretty clear to me that Mr. Robertson needs a secure facility and a well-structured facility based upon his conduct[.]

The circuit court ordered the West Virginia multidisciplinary team to continue to be involved in Mr. Robertson's treatment and stated that the court would hold review hearings every ninety days to monitor his treatment.[9]

After entry of this order, Mr. Robertson filed the present appeal.

## II.  Standard of Review

Mr. Robertson is challenging the circuit court's final order transferring him to the South Carolina facility.  In Syllabus Point 2 of *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997), we held that

> [i]n reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review.  We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.  Questions of law are subject to a *de novo* review.

In reviewing the circuit court's final order, we are mindful that "both by statute and case law, a trial court has broad discretion to determine the appropriate disposition of those found not guilty by reason of insanity."  *State v. Catlett*, 207 W.Va. 740, 745, 536 S.E.2d 721, 726 (1999).  With these standards in mind, we turn to the parties' arguments.

## III.  Analysis

---

[9] The circuit court stated that Mr. Robertson could participate in these review hearings through video conference or telephone.

Mr. Robertson raises three assignments of error in this appeal: (1) the order transferring him to South Carolina violates the transportation clause of the West Virginia Constitution, art. III, § 5; (2) the transfer is inconsistent with the statutory directive requiring him to be placed in the "least restrictive environment" to manage his mental health problems; and (3) the transfer is not permitted under the Interstate Compact on the Mentally Disordered Offender, *W.Va. Code* § 27-15-1.

### A. Transportation Clause

Mr. Robertson argues that his transfer to the South Carolina treatment facility is barred by the transportation clause contained in the West Virginia Constitution, art. III, § 5, which states, "No person shall be transported out of, or forced to leave the State for any offence committed within the same[.]"[10] The crux of Mr. Robertson's argument is that he has been forcibly banished to South Carolina in violation of the transportation clause. We note that "banishment" is

---

[10] Section 5 of article III of the West Virginia Constitution provides,

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. Penalties shall be proportioned to the character and degree of the offence. No person shall be transported out of, or forced to leave the State for any offence committed within the same; nor shall any person, in any criminal case, be compelled to be a witness against himself, or be twice put in jeopardy of life or liberty for the same offence.

13

generally defined as punishment by forced exile either for years or for life; [or] a punishment inflicted on criminals, by compelling them to quit a city, place, or country, for a period of time, or life. Historically, 'banishment' was inflicted principally upon political offenders, transportation being the word used to express a similar punishment of ordinary criminals.

The transportation clause, as it presently exists in W.Va. Const. art. III, § 5, was first included in our Constitution that was adopted by the Constitutional Convention of 1872, held in Charleston. However, a detailed study of the proceedings of that 1872 convention offers little insight into the reason for the clause's appearance.

*Ray v. McCoy*, 174 W.Va. 1, 7, 321 S.E.2d 90, 96 (1984) (McHugh, J., dissenting) (internal citations omitted).

This Court discussed the transportation clause in *Ray v. McCoy*, *supra*. *Ray* dealt with two West Virginia prisoners who were involuntarily transferred to California prisons. The prisoners argued that their forced transfers were not permitted under the transportation clause of the West Virginia Constitution. This Court agreed and held in Syllabus Point 1 of *Ray* that

[t]he clause "[n]o person shall be transported out of, or forced to leave the State for any offense committed within the same," of W.Va. Const. art. III, § 5, prevents a prisoner convicted under West Virginia law from involuntarily serving any portion of a state sentence beyond the West Virginia borders.

Mr. Robertson states that the transportation clause is applicable to the present case because he is a "person" within the circuit court's jurisdiction as a result of an offense he committed within the state. Mr. Robertson argues that like the two prisoners in *Ray*, he

14

did not consent to being transferred to an out-of-state facility. *Ray* is distinguishable from the present case, however, because it dealt with two prisoners who had been "convicted under West Virginia law." Mr. Robertson has not been convicted of a crime, nor is he a prisoner of the state. Instead, Mr. Robertson is under the circuit court's jurisdiction because he pled not guilty to arson by reason of mental illness. The circuit court has jurisdiction over Mr. Robertson pursuant to *W.Va. Code* § 27-6A-1, *et seq*. [2007]. *W.Va. Code* § 27-6A-4(e) states, in relevant part, "[t]he court shall commit the acquitee to a mental health facility designated by the department (DHHR) that is the least restrictive environment to manage the acquitee and that will allow for the protection of the public."

*Ray* is also distinguishable from the present case because of the reason for the transfer. In *Ray*, the prisoners were transferred to out-of-state facilities for punitive reasons. In the present case, Mr. Robertson was transferred to South Carolina to receive treatment. The transportation clause prevents a person from being forced to leave the state "for any offence committed within the same." The circuit court stated "[w]e are not contemplating penalizing him [Mr. Robertson] for his criminal conduct." Instead, the circuit court was following the recommendations of the DHHR, Dr. Clayman, and Ms. Bradstreet, who stated that the South Carolina facility was the best treatment option available to Mr. Robertson. Thus, Mr. Robertson was not transferred to South Carolina because of an offense he committed within the state, he was transferred to South Carolina to be treated for his mental illness.

For this reason, we also reject Mr. Robertson's equal protection argument. Mr. Robertson asserted that "if a prisoner can refuse to consent to his transfer . . . no rational basis exists for treating a forensic patient any differently[.]" The difference between a forensic patient and a prisoner, in this instance, is that the forensic patient is being sent to an out-of-state facility for treatment purposes, whereas the prisoner is being sent out-of-state for punitive reasons. The circuit court determined that Mr. Robertson suffers from a mental illness, was a danger to himself and to others, that no facility in West Virginia could treat his mental illness,[11] and that the South Carolina facility offered treatment that was unavailable in West Virginia. Because the circuit court transferred Mr. Robertson to the South Carolina facility for treatment purposes, rather than to punish him, we find no merit in Mr. Robertson's equal protection argument.

One final distinguishing factor between the present case and *Ray* is that Mr. Robertson was sent to the South Carolina facility for a limited period of time.[12] The circuit court did not set a fixed period of time that Mr. Robertson would remain in South Carolina, however, two factors demonstrate that the transfer was plainly not intended to be permanent. First, the DHHR's stated goal for Mr. Robertson is to "get him treatment and then meet with

---

[11] The circuit court found that "[t]he Defendant suffers from an Axis 1 Psychosis, Not Otherwise Specified, as well as an Axis 2 Antisocial Personality Disorder." While Mr. Robertson's lawyer disputed this conclusion and argued that Mr. Robertson's mental illness is in remission, we find that the circuit court's conclusion is supported by the testimony of Dr. Miller, Dr. Clayman, and Ms. Bradstreet.

[12] The prisoners in *Ray* were sent to California to serve the remainder of their sentences.

everyone here in West Virginia, [and] bring him back." Second, in order to monitor Mr. Robertson's treatment, the circuit court ordered that hearings be held every ninety days to keep the court informed of Mr. Robertson's progress. Based on these factors, we are satisfied that Mr. Robertson was not sent to South Carolina to be "warehoused" indefinitely.

By way of analogy, we note that a juvenile may be sent to an out-of-state facility to receive treatment when the DHHR is unable to locate an in-state facility that can treat the juvenile's specific problem. In Syllabus Point 6 of *State ex rel. West Virginia Department of Health and Human Resources v. Frazier*, 198 W.Va. 678, 482 S.E.2d 663 (1996), the Court held,

> While a circuit court should give preference to in-state facilities for the placement of juveniles, if it determines that no in-state facility can provide the services and/or security necessary to deal with the juvenile's specific problems, then it may place the child in an out-of-state facility. In making an out-of-state placement, the circuit court shall make findings of fact with regard to the necessity for such placement.

Before a juvenile can be sent to an out-of-state facility, "it is the duty of multidisciplinary treatment teams to provide courts with information that is necessary to make an informed decision as to which facility can best meet a juvenile's needs." *E.H. v. Matin*, 201 W.Va. 463, 468, 498 S.E.2d 35, 40 (1997).

In the present case, Mr. Robertson had a multidisciplinary team that presented the circuit court with the information it needed to determine which facility offered the best treatment option for his mental illness. The circuit court found that no in-state facility was

17

available to treat Mr. Robertson's mental illness and made findings of fact with regard to the necessity of placing Mr. Robertson in the South Carolina facility.

Though not raised by either party, we note that the circuit court's final order sending Mr. Robertson to South Carolina is consistent with the Interstate Compact on Mental Health,[13] set forth in *W.Va. Code* § 27-14-1 [1957], which states, in relevant part, "[A]ny patient may be transferred to an institution in another state whenever there are factors based upon clinical determinations indicating that the care and treatment of said patient would be facilitated or improved thereby." The testimony before the circuit court was that Mr. Robertson's two placements in West Virginia psychiatric hospitals, as well as his community placement, had failed and that the South Carolina treatment facility offered treatment that was unavailable in West Virginia.

---

[13] The Interstate Compact on Mental Health is a compact among forty-five states, including West Virginia and South Carolina. *W.Va. Code* § 27-14-1, art. I of the Compact sets forth the purpose of the agreement as follows:

> The party states find that the proper and expeditious treatment of the mentally ill and mentally deficient can be facilitated by cooperative action, to the benefit of the patients, their families, and society as a whole. Further, the party states find that the necessity of and desirability for furnishing such care and treatment bears no primary relation to the residence or citizenship of the patient but that on the contrary, the controlling factors of community safety and humanitarianism require that facilities and services be made available for all who are in need of them.

18

Finally, we observe that Justice Miller anticipated a scenario similar to the present case in his concurring opinion in *Ray*. Justice Miller noted that the West Virginia Constitution does not prevent the State "from temporarily removing a prisoner in this State for out-of-state treatment." *Ray*, 174 W.Va. at 6, 321 S.E.2d at 95. Similarly, we find nothing in *Ray* or in the West Virginia Constitution that prevents the State from sending an acquitee under *W.Va. Code* § 27-6A-1 *et seq.* to an out-of-state facility to receive treatment.

Based on all of the above, we hold that the clause "[n]o person shall be transported out of, or forced to leave the State for any offence committed within the same," contained in the West Virginia Constitution, art. III, § 5, does not prevent the State from sending an acquitee under *W.Va. Code* § 27-6A-1 *et seq.* to an out-of-state facility to receive treatment.

## B. Least Restrictive Environment

Mr. Robertson next argues that the circuit court's order transferring him to the South Carolina facility is inconsistent with the statutory directive requiring him to be placed in the "least restrictive environment" to manage his mental illness. *W.Va. Code* § 27-6A-4(e) states, in relevant part, "[T]he court shall commit the acquitee to a mental health facility designated by the department that is the least restrictive environment to manage the acquitee and that will allow for the protection of the public." Similarly, *W.Va. Code* § 27-6A-5(a)

19

discusses the scenario in which an acquitee under *W.Va. Code* § 27-6A-1 *et seq.*, who has been released into a less restrictive placement, violates the conditions of his or her release:

> Upon notice that an acquitee released on the condition that he or she continues appropriate treatment does not continue his or her treatment, the prosecuting attorney responsible for the charges brought against the acquitee at trial shall, by motion, cause the court to reconsider the acquitee's release and upon a showing that the acquitee is in violation of the conditions of his or her release, the court may reorder the acquitee to a mental health facility designated by the department which is *the least restrictive setting appropriate to manage the acquitee and protect the public.*

(Emphasis added.)

Mr. Robertson argues that the South Carolina placement is the most restrictive placement possible and that this placement is a violation of the above statutes. Mr. Robertson states that the South Carolina facility is more akin to a prison than a medical treatment facility. Further, Mr. Robertson asserts that he was sent to the South Carolina facility solely for the purpose of managing his behavior, not for treatment. We disagree.

The circuit court's final order states, "The issue is the appropriate placement of the Defendant in the least restrictive environment to obtain treatment." The circuit court ordered that Mr. Robertson be sent to the South Carolina facility for treatment purposes. The DHHR, Dr. Clayman, and Ms. Bradstreet agreed that the South Carolina facility could provide Mr. Robertson with treatment for his mental illness. Dr. Clayman adamantly testified that he would "blow the whistle" on the South Carolina facility if he believed Mr. Robertson was being punished or mistreated there. Similarly, the circuit court ordered that

20

hearings be held every ninety days to review Mr. Robertson's treatment progress and to determine if the South Carolina placement continued to be in his best interest.

Ms. Bradstreet testified that it was her duty as the DHHR statewide forensic coordinator to find the least restrictive environment to treat Mr. Robertson. She stated "it is my belief that this [South Carolina treatment facility] is the least restrictive environment for Mr. Robertson."[14] There was no testimony or evidence introduced during the placement hearing that rebutted Ms. Bradstreet's conclusion that the South Carolina treatment facility was the least restrictive placement option.

The only alternative placement option suggested by Mr. Robertson was that he be placed in the community under the care of mental healthcare professionals.[15] Both Dr. Clayman and Dr. Miller testified that if placed back into the community, Mr. Robertson will commit another criminal offense. Additionally, when Mr. Robertson was previously placed in the community, he suffered multiple psychotic episodes. The circuit court determined that Mr. Robertson remained a danger to himself and to others. Because the protection of the public is a consideration a court must consider pursuant to *W.Va. Code* § 27-6A-4(e), we

---

[14] Ms. Bradstreet's opinion was based on her visiting the South Carolina facility, talking to officials there, and talking to officials in Florida, Georgia, and Hawaii, who had also placed forensic patients in the South Carolina facility.

[15] Ms. Bradstreet testified that Mr. Robertson was not a candidate for Sharpe's transitional living facility, a 12-bed facility that is a "group home atmosphere." Ms. Bradstreet stated that Mr. Robertson's history of not following rules and of violently targeting other patients prevented him from being considered as a candidate for this facility. Ms. Bradstreet stated, "There are a couple lower-functioning people or gentleman in that facility who . . . [Mr. Robertson] would have a great potential to victimize."

agree with the circuit court's conclusion that a community placement was not a viable option for Mr. Robertson.

Based on all of the above, we find no error with the circuit court's conclusion that the South Carolina facility was the least restrictive placement option for Mr. Robertson.

## C. Transfer to a Private Facility in Another State

Mr. Robertson's final assignment of error is that the DHHR does not have the statutory authority to transfer him to a private facility in another state. Before examining whether the DHHR possesses the statutory authority to enter into a contract with an out-of-state facility, we observe that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syllabus Point 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). However, if a statute is plain, this Court lacks authority to construe its provisions, and we must instead apply its clear terms. "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syllabus Point 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W.Va. 137, 107 S.E.2d 353 (1959).

22

Mr. Robertson states that the transfer was made pursuant to the Interstate Compact on the Mentally Disordered Offender, *W.Va. Code* § 27-15-1 [1970].[16] This compact was enacted to "improve . . . the care and treatment of mentally disordered offenders." *W.Va. Code* § 27-15-1, art. I (a). The goal of the compact is to allow cooperation between the states and to utilize treatment facilities in other states that can provide effective treatment to mentally disordered offenders.[17]

Mr. Robertson argues that the compact does not allow the DHHR to contract with a private facility in another state. Further, he argues that the contract with the South Carolina facility was not reviewed by the circuit court to determine whether the private facility's treatment procedures were proper.

---

[16] *W.Va. Code* § 27-15-1, art. II (a), states:

> "Mentally disordered offender" means a person who has been determined, by adjudication or other method legally sufficient for the purpose in the party state where the determination is made, to be mentally ill and:
> (1) Is under sentence for the commission of crime; or
> (2) Who is confined or committed on account of the commission of an offense for which, in the absence of mental illness, said person would be subject to incarceration in a penal or correctional facility.

[17] The compact states its purpose is to

> [a]uthorize cooperation among the party states in providing services and facilities, when it is found that cooperative programs can be more effective and efficient than programs separately pursued.

*W.Va. Code* § 27-15-1, art. I (a)(3).

23

The State argues that Mr. Robertson's interpretation of the compact on the mentally disordered offender is overly restrictive. The State asserts that the compact was intended to allow cooperation between the states and to provide states with additional options in treating their mentally disordered offenders. In support of this argument, the State cites the following portion of the compact:

> Nothing contained in this compact shall be construed to abrogate or impair any agreement or other arrangement which a party state may have with a nonparty state for the custody, care, treatment, rehabilitation or aftercare of patients nor to repeal any other laws of a party state authorizing the making of cooperative arrangements.

*W.Va. Code* § 27-15-1, art. X. The compact also states that "[t]he provisions of this compact shall be liberally construed[.]" *W.Va. Code* § 27-15-1, art. XI.

We conclude that the compact, by its own terms, is not meant to restrict or impair agreements states can make regarding the treatment and care of their mentally disordered offenders. The compact was enacted to allow states to locate treatment facilities for its mentally disordered offenders outside of its own borders. There is no prohibition in the compact forbidding the state from contracting with a private treatment facility in another state. In the present case, Ms. Bradstreet identified a facility in South Carolina that could treat Mr. Robertson's mental illness. She visited this facility, discussed the treatment program Mr. Robertson would receive with officials there, and assured the circuit court that the treatment team in South Carolina would maintain contact with Mr. Robertson's multidisciplinary team in West Virginia. Additionally, the circuit court ordered, and has

24

held, review hearings every ninety days to monitor Mr. Robertson's treatment progress at the South Carolina facility.

We find nothing in the compact that forbids Mr. Robertson's transfer to the South Carolina facility to receive treatment. We therefore conclude that the circuit court's final order was not in violation of the Interstate Compact on the Mentally Disordered Offender, *W.Va. Code* § 27-15-1.

## IV.  Conclusion

The circuit court's September 30, 2011, final order is affirmed.

Affirmed.